IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROGER HOEPPNER and
MARJORIE HOEPPNER,

                                                    OPINION AND ORDER

                        Plaintiffs,

                                                    17-cv-430-bbc

            v.

CHIEF DEPUTY CHAD BILLEB, CAPTAIN GREG BEAN,
LIEUTENANT SEAN MCCARTHY, MARATHON COUNTY,
LIEUTENANT RYAN BERDAL and DEPUTY ERIC HEGGELUND,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Roger and Marjorie Hoeppner are proceeding on claims under the First and

Fourth Amendments arising out of events that occurred while law enforcement officers from

the Marathon County Sheriff's Department were enforcing a writ of execution at plaintiffs'

home. (Plaintiffs also raised a Fourteenth Amendment claim in their third amended

complaint, but as discussed below, they have withdrawn that claim.) Specifically, plaintiffs

contend that defendants Chief Deputy Chad Billeb, Captain Greg Bean, Lieutenant Sean

McCarthy, Lieutenant Ryan Berdal, Deputy and Eric Heggelund used an unreasonable

amount of force in enforcing the writ, arrested Roger Hoeppner without probable cause and

confiscated and destroyed his cell phone and camera. Plaintiffs also name Marathon County

as a defendant solely because of its obligations to indemnify the individual defendants under

Wis. Stat. § 895.46.

The parties' cross motions for summary judgment are before the court. Defendants

contend that they are entitled to absolute and qualified immunity with respect to all of plaintiffs' claims. Dkt.# 44. In the alternative, defendants argue that plaintiffs cannot prove any violation of their rights. Plaintiffs have filed a motion for partial summary judgment with respect to plaintiff Roger Hoeppner's false arrest claim only, contending that no reasonable jury could conclude that defendants had probable cause to arrest him. Dkt. #58.

For the reasons set out below, I am granting defendants' motion with respect to plaintiffs' claims that defendants used an unreasonable amount of force in enforcing the writ of execution and violated their rights to procedural due process. I am denying defendants' motion in all other respects. Plaintiffs' motion will be denied because there are genuine disputes of material fact regarding whether defendants had probable cause to arrest plaintiff Roger Hoeppner.

From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted. Although both Roger Hoeppner and Marjorie Hoeppner brought this lawsuit, only Roger Hoeppner's actions are at issue. Therefore, all references to "plaintiff" are to Roger Hoeppner.

I note that defendants argue in their reply brief, dkt. #71 at 2-3, that plaintiff's declaration, dkt. #65, should be disregarded under the "sham affidavit" rule because it contradicts testimony he gave in his deposition. Under the "sham affidavit rule," a court may disregard an affidavit offered solely to contradict the affiant's previous deposition testimony "unless the affiant gives a plausible explanation for the discrepancy." Beckel v.

Wal-Mart Associates, Inc., 301 F.3d 621, 623 (7th Cir. 2002).  In this case, defendants argue that plaintiff's declaration is a "sham" because he states that his cell phone and camera were taken by deputies prior to his arrest, contrary to the statements in his deposition. Defendants are mistaken.  Plaintiff testified in his deposition that his cell phone and camera were taken shortly after he approached officers on the road at the end of his driveway, before they arrested him.  Plaintiff's dep., dkt. #50, at 95 ("As I walked up . . . they took my cell phone and camera away from me.").  Because defendants have identified no other basis for striking plaintiff's declaration, I have considered it in setting forth the undisputed facts below.

## UNDISPUTED FACTS

### A.  The Parties

Plaintiffs Roger Hoeppner and Marjorie Hoeppner have lived in the Town of Stettin, Wisconsin, at 9598 Packer Drive, since 1960.  Their adult son, Scott Hoeppner, lives with them.  Plaintiff operates a business buying and selling used wooden pallets and keeps trucks, machinery and stacks of pallets on his property in connection with his business.  At all times relevant to this case, defendants Chief Deputy Chad Billeb, Captain Greg Bean, Lieutenant Sean McCarthy, Lieutenant Ryan Berdal, and Deputy Eric Heggelund worked for the Marathon County Sheriff's Department.

## B. Town of Stettin Lawsuit against Plaintiffs

In 2008, the Town of Stettin brought an action against plaintiffs in the Circuit Court for Marathon County, seeking to enforce town ordinances relating to farm equipment, rubbish and other items located on plaintiffs' property. In March 2009, the town filed an amended complaint, alleging that plaintiffs had sold farm equipment illegally and had violated the town's zoning code and public nuisance ordinance. In June 2009, plaintiffs and the town notified the state court that they had reached a settlement. Relying on the parties' settlement agreement, the court entered an order stating that plaintiffs would relocate and remove certain property from their premises by August 30, 2009.

Approximately one year later, in July 2010, the town filed a motion for contempt and enforcement of the settlement agreement. At the contempt hearing on August 24, 2010, the parties entered into an agreement under which plaintiffs agreed to a finding of contempt and agreed to relocate and remove several items from their property within 30 days. In October 2010, after being told by the town that plaintiffs had not complied with their agreement, the circuit court judge visited plaintiffs' property. The court found that plaintiffs had still not removed the items. The court then held various review hearings to determine whether plaintiffs had purged their contempt.

On May 24, 2011, the circuit court judge visited the property again and determined that plaintiffs were not in compliance with the court order and still had not purged their contempt. The court imposed a monetary penalty for all the days plaintiffs had failed to purge their contempt and authorized additional forfeitures for each day plaintiffs remained

in noncompliance. The court also stated that if plaintiffs did not remove the items from their property by June 24, 2011, the court would "authoriz[e] the town to remove whatever property is not in compliance." The court directed the town to draft a proposed order.

On June 14, 2011, the town submitted a proposed order to the court. After receiving no objection from plaintiffs, the court signed the proposed order on June 23, 2011. The order authorized the town to enter plaintiffs' property and remove all farm equipment, pallets and other materials. On June 27, July 1 and July 11, 2011, members of the Marathon County Sheriff's Department assisted the town in removing the property specified by the order. Much of the property seized during June and July 2011 was sold at auction.

During the July 11 clean-up, plaintiff engaged in a verbal dispute with one of the sheriff deputies regarding the location of his truck. The deputy reported that plaintiff became belligerent, angry and "very excited as he was red in the face and moving with rigid and exaggerated movements." Plaintiff climbed into his truck and refused to move, telling officers they would have to arrest him. Officers then removed him from his truck and arrested him for obstructing and resisting an officer.

On May 9, 2012, the court granted the town's "motion for judgment to recoup costs and expenses for compliance with court orders." Two judgments were entered against plaintiffs in the amounts of $11,568.21 and $25,897.60.

C. <u>Sheriff's Department's Interactions with Plaintiff and Scott Hoeppner</u>

Between 2011 and 2014, the Marathon County Sheriff's Department responded to

numerous incidents involving plaintiff or his son Scott Hoeppner. The incidents stemmed primarily from concerns by Town Chairman Matthew Wasmundt that plaintiff and his son could cause or were in the process of causing disturbances at town meetings.

In 2012 and 2013, Scott Hoeppner was cited for disorderly conduct involving interactions with Town Chairman Wasmundt. In both instances, the state court issued a no-contact order against Scott Hoeppner, who pleaded no contest to both charges.

On June 22, 2012, the Marathon County Sheriff's Department provided assistance to town officials conducting an inspection of plaintiffs' property. During the inspection, Scott Hoeppner was arrested for disorderly conduct, based on his allegedly gesturing with his hands toward town officials as if he were shooting them.

On June 26, 2012, the sheriff's department opened an investigation into a complaint that one of the town attorneys intimidated plaintiff following a court proceeding.

On June 23, 2014, the sheriff's department responded to a call from Town Chairman Wasmundt on Packer Drive. Wasmundt reported that while driving past plaintiff's home, Wasmundt encountered plaintiff in the roadway, blocking the road. The incident report noted that "this is a long running feud between Wasmundt and Hoeppner" and that "both parties are confrontational towards each other." No citations were issued.

D. Marathon County Sheriff's Department Satisfies Writ of Execution

In September 2014, the Town of Stettin sought a writ of execution against plaintiff and his wife from the circuit court to satisfy the forfeiture judgment. The court granted the

writ on September 4, 2014, which authorized the removal of "any and all personal property located on 9508 Packer Drive and/or nearby parcels of real estate owned by Roger and/or Marjorie Hoeppner," subject to exemptions outlined in the writ, and including real estate if personal property was insufficient to satisfy the judgment. The personal property subject to the writ included large items such as forklifts, cars, trucks, tractors, lawn mowers, semi-trailers and other large items, all of which were located on plaintiffs' property. Plaintiffs were not notified when the court granted the writ, though their attorney at the time had warned them that the town could seek a writ of execution and satisfy the writ by confiscating property.

In 2014, defendant Captain Bean was the commander of the Marathon County Sheriff's Department "special response team" and was responsible for planning "high risk" operations. He became involved in planning the execution of the 2014 writ of execution at plaintiffs' property soon after the writ was signed by the circuit judge. Shortly before October 2, 2014, senior members of the sheriff's department met for a briefing and discussed how the writ would be satisfied. In planning the satisfaction of the writ, the sheriff's department considered all of its previous dealings with plaintiff and his son, Scott Hoeppner.

Captain Bean was aware of the history of animosity and verbal altercations between the Hoeppners and town officials and the sheriff department's interventions between plaintiff and Matthew Wasmundt at town meetings. He had also heard that during one of those meetings, plaintiff had responded to someone's stated intention to call the sheriff's department by stating something to the effect of, "You're going to need their protection."

Captain Bean was also aware, secondhand, that someone at plaintiffs' residence had pantomimed pointing a gun at deputies. He was aware of nothing else that he could characterize as a direct threat on plaintiff's part. In particular, although Captain Bean was aware of occasions on which plaintiff had raised his voice and uttered profanity, he was not aware of any occasion on which plaintiff had been physically violent toward Marathon County deputies.

In planning the execution of the writ, defendants considered the sheriff department's history with plaintiff and his son, as well as an unrelated incident that had occurred in Richland County, Wisconsin. During that incident, law enforcement officers serving a writ of execution were met by gunfire from high powered rifles and eventually had to deploy three rescue armored trucks to complete the writ of execution.

Defendant Captain Bean knew there was a possibility that if plaintiffs were advised of the existence of the writ and the date, time and nature of the planned operation, they might simply decide to pay the judgment. Nonetheless, defendants Bean, McCarthy, Heggelund, Billeb and Deputy Dean Pitt collectively made the decision not to inform plaintiffs of the date and time of the execution of the writ. Defendants worried that the sheriff's department could be met with force or hostility from the Hoeppners if defendants divulged the date and time of their appearance. The same group, with the exception of Chief Deputy Billeb, was involved in the decisions as to the number of personnel that would be deployed to execute the writ and how they would be equipped.

The sheriff's department served the writ of execution on plaintiffs on October 2,

2014. On that date, 24 law enforcement officials and one Lenco Bearcat vehicle were assigned to Packer Drive. The Lenco Bearcat looks like an armored military vehicle with a machine gun turret on top, but it is not actually equipped with weapons. It is not a military-grade vehicle and is built on a Ford F-550 frame. The plan was for two deputies to try to make contact with plaintiff at his home and explain that the sheriff's department was there to serve the writ and satisfy a court order. The remaining law enforcement officials and the Bearcat would remain in a staging area approximately three-quarters of a mile away from the home on Packer Drive. The staging area also involved non-law enforcement persons, including tow operators, to collect and haul the property described in the writ. After the two deputies made contact with plaintiff, the other law enforcement officers would proceed to carry out the writ.

On the morning of October 2, 2014, two deputies approached plaintiffs' home and knocked on the door. Plaintiffs did not hear the knock. The two deputies reported back via radio to the remaining individuals at the staging area, informing them they had not made contact with anyone, but that they saw movement inside the home and believed that someone was inside. Some of the remaining deputies and the Bearcat were then brought up to the roadway in front of the home. At this point, the law enforcement officers believed that at least one individual was inside the home but was refusing to respond to their attempts to make contact.

Meanwhile, plaintiff was sitting at a table in his house preparing to take his medications, when he saw cars on Packer Drive. Both Marjorie and Scott Hoeppner were

still in their bedrooms. Plaintiff got up, looked out his kitchen window, and saw a sheriff's deputy standing behind the garage with his pistol drawn and pointing at the front door. Behind that deputy, plaintiff saw another deputy, running in a crouched position with an automatic weapon in his hand. Plaintiff called 911. The dispatcher told plaintiff that the deputies were at his home to serve "paperwork and documents from the court." Plaintiff responded, "Guys in full armor dress with pistols drawn?" The dispatcher then asked if he or anyone needed medical assistance or anything else, but plaintiff declined, instead insisting on receiving a copy of the 911 call transcript. He then telephoned his attorney, Ryan Lister, and asked him to come right away. Lister was surprised by the call, because the town's attorney had never told him the town had obtained a writ and planned to execute its judgment on the property. Lister then drove to plaintiffs' property but was stopped by deputies at a roadblock at the staging area approximately three-fourth a mile up Packer Drive from plaintiffs' property.

A short time later, plaintiff saw what he believed to be Lister's car come to a stop on Packer Drive, so he left his house and walked down his driveway to Packer Drive with the intention of speaking with Lister. Plaintiff walked past some of the officers and ignored their attempts to engage him in conversation. On the way, he stopped at his truck to retrieve his camera and then took pictures of the armored vehicle and some of the deputies on Packer Drive. Plaintiff was angry and began yelling, swearing and pointing fingers at the deputies, including saying "Fuck this" in an angry voice. According to plaintiff, a deputy then confiscated plaintiff's camera and cell phone. Plaintiff walked from his house down his

driveway to the road, where a number of deputies, including defendant Sean McCarthy, were standing.

Subsequently, a deputy spoke to plaintiff, held up the writ, and said, "We're here to serve this writ. It's $86,000. We'll drop it $6,000. We'll drop it down to $80,000. We need it today. Today. Not tomorrow. Not this afternoon. Today. This morning." Plaintiff asked the deputy, sarcastically, whether he had $80,000 on his person. Defendant Lieutenant McCarthy told plaintiff that he needed to cooperate and that he was on a short leash. (According to defendants, plaintiff was told to calm down and stop walking around the property to allow for the safety of himself and other officers who were going to remove the property. Defendants say that plaintiff refused to stop walking around and instead yelled at the deputies that they would have to arrest him. For his part, plaintiff denies that he was acting boisterously or belligerently, denies that he was "walking around the property," denies that he was interfering with or impeding the deputies in any way and denies that he was given any orders.) Defendant McCarthy then told plaintiff he was under arrest for disorderly conduct. Plaintiff was then handcuffed and placed into a squad car by defendants Deputies Berdal and Heggelund.

After plaintiff was placed in the squad car, defendant Chief Billeb told plaintiff that the sheriff's department had brought as many law enforcement officers as they had and the Bearcat to execute the writ because of the known animosity between the Hoeppners and the Town of Stettin. Plaintiff vigorously disputed the need for the level of force deployed. Plaintiff then asked if he could be taken to the bank so that he could obtain money to pay

11

the judgment and satisfy the writ. After Chief Billeb agreed that plaintiff could satisfy the writ with a check, Billeb suspended the execution of the writ and directed a deputy to take plaintiff to the bank, where plaintiff withdrew the funds to pay the judgment and gave the check to the sheriff's department. Plaintiff was then taken home.

On October 29, 2014, defendant McCarthy mailed plaintiff a citation for disorderly conduct. The citation states:

> During the course of a civil process execution of property at the defendant's residence, numerous attempts were made to contact the defendant, who was believed to be in his residence. The defendant eventually emerged from the residence and made contact with the numerous law enforcement officers on the roadway in front of his residence.
>
> The defendant demanded to know why we were there. Despite informing him of our legal authority to do so, the defendant walked around, took pictures of the officers and vehicles and began saying "fuck this" in a loud and disruptive manner. I informed the defendant we were being professional and he didn't need to act that way. After being informed he would be on a "short leash" the defendant told me, "then go ahead and take me in (arrest)."
>
> Detective Berdal and deputy Heggelund secured the defendant and he was handcuffed. He was ultimately placed and transported in Deputy Anderson's squad. Shortly thereafter, I was informed the defendant wished to cooperate and a deal was reached with the Stettin township. The defendant became more cooperative, to the point he was released from custody and advised a summons would be issued at a later date.

Plaintiff's attorney, Ryan Lister, appeared for plaintiff in the disorderly conduct case and filed a motion to dismiss, demand for trial by jury and motion for a jury view of the armored vehicle. After these filings, the prosecutor moved the court to dismiss the charge, and the case was dismissed.

OPINION

Plaintiffs raise the following claims against defendants:

(1) defendants seized and destroyed plaintiff's cell phone and camera in violation of the Fourth Amendment;

(2) defendants deployed unreasonable physical force in enforcing the writ of execution in violation of the Fourth Amendment;

(3) defendants McCarthy, Berdal and Heggelund arrested plaintiff without probable cause in violation of the Fourth Amendment; and

(4) defendants confiscated plaintiff's cell phone and camera to prevent him from recording their activities, in violation of the First Amendment.

Plaintiffs also include an indemnification claim against Marathon County under Wis. Stat. § 896.46. (Plaintiffs also raised a Fourteenth Amendment due process claim in their third amended complaint, but they withdrew that claim in response to defendants' motion for summary judgment. Plts.' Br., dkt. #70, at 11. Thus, I will grant summary judgment to defendants as unopposed with respect to the due process claim.)

Defendants argue that they are entitled to summary judgment in their favor on all of plaintiffs' claims because they are immune from suit under various doctrines. Defendants also argue that no genuine disputes of material fact preclude summary judgment in their favor with respect to the merits. For their part, plaintiffs argue that they are entitled to summary judgment on plaintiff's false arrest claim. I address each of the parties' arguments below.

## A.  Eleventh Amendment Immunity

Defendants' first argument is that they are entitled to immunity under the Eleventh Amendment with respect to all of plaintiffs' claims because they are being sued for actions taken to carry out a writ of execution issued by a state court.  It is well-established that the Eleventh Amendment bars lawsuits brought by private individuals against state employees who are being sued for damages in their *official* capacities, but the Eleventh Amendment does not bar claims against public employees in their individual capacities.  Ameritech Corp. v. McCann, 297 F.3d 582, 586 (7th Cir. 2002) ("[I]ndividual capacity suits do not implicate the Eleventh Amendment's protections[.]"); Brokaw v. Mercer County, 235 F.3d 1000, 1009 (7th Cir. 2000) ("Federal suits against state officials in their official capacities are barred by the Eleventh Amendment . . . [but] [a]n individual capacity suit is not barred by the Eleventh Amendment.").

In this instance, plaintiffs have sued defendants in their individual capacities, not in their official capacities.  Thus, the Eleventh Amendment does not bar plaintiffs' claims.  All of the cases cited by defendants in support of their argument are distinguishable for the simple reason that they involve official-capacity claims.  E.g., McMillian v. Monroe County, Alabama, 520 U.S. 781, 784 (1997); Richman v. Sheahan, 270 F.3d 430, 439 (7th Cir. 2001); Scott v. O'Grady, 975 F.2d 366, 369 (7th Cir. 1992).  Defendants' suggestion that Wisconsin Chapter 815, which governs writs of execution, converts plaintiffs' claims into official capacity claims,  is not persuasive.  Plaintiffs are not challenging any state procedures regarding writs of execution and have not alleged that any state laws or policies caused their

14

injuries.

Also unpersuasive is defendants' argument that plaintiffs' claims are barred by the Eleventh Amendment because the writ of execution was a "judicial command," in contrast to the mere court "authorization" provided by the search and arrest warrants in the cases cited by plaintiffs. Dfts.' Br., dkt. #71, at 5. Defendants argue that because the writ of execution was a direct court order, plaintiffs' challenges to defendants' actions enforcing the writ are necessarily challenges to an "official" state action protected by the Eleventh Amendment. However, defendants cite no legal authority to support this argument. In particular, they cite no authority to support the proposition that the type of court order at issue–a writ of execution versus a search or arrest warrant–determines whether a claim is an individual or official capacity claim. Instead, whether a claim is an "official" or "individual" capacity claim depends on whether the plaintiff is seeking to recover from an individual for the individual's actions or from the state in reliance on an official state policy or procedure.

The Supreme Court has explained that official capacity suits are a "way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985). A claim is an official capacity claim if "the state is the real, substantial party in interest." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101 (1984). "[T]he general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought," Virginia Office for Protection & Advocacy v. Stewart, 563 U.S. 247, 256 (2011) (citation omitted) and in particular, whether the state would be required to pay funds from its treasury or be restrained or required to act. Pennhurst, 465

15

U.S. at 134, n.11.  Additionally, the entity itself must be "a moving force behind the deprivation" and the entity's "policy or custom must have played a part in the violation of federal law."  Graham, 473 U.S. at 166 (citations omitted).  In contrast, a suit is a "personal-capacity suit" if it "seeks to impose personal liability upon a government official for actions he takes under color of state law."  Id. at 165.  See also Pennhurst, 465 U.S. at 102 ("[A] suit challenging the constitutionality of a state official's action is not one against the State.")

In this instance, plaintiffs are challenging specific conduct by the individual defendants and are seeking damages from defendants for their individual actions.  Plaintiffs are not seeking funds from the state treasury and are not asking for an injunction against the state.  Neither are they challenging state law regarding writs of execution nor alleging that any state policy or practice was the "moving force" behind defendants' actions.  Accordingly, defendants are not entitled to Eleventh Amendment immunity.


B.  Quasi-Judicial Immunity

Next, defendants argue that they are entitled to quasi-judicial immunity, which is a form of absolute immunity derived from judicial immunity, with respect to all of plaintiffs' claims.  Defendants argue that they are protected by quasi-judicial immunity because their allegedly unlawful actions were taken in an effort to execute a court order.  This immunity argument also fails.

Judges are entitled to absolute immunity from claims for money damages based on their judicial conduct.  Richman, 270 F.3d at 434 (citing Mireles v. Waco, 502 U.S. 9,

11–12 (1991); <u>Forrester v. White</u>, 484 U.S. 219, 225–29 (1988)).  Judicial immunity was recognized at common law "as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error" and to "protect[ ] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants."  <u>Forrester</u>, 484 U.S. at 225.  The absolute immunity afforded to judges has been extended to cover the quasi-judicial conduct of some "[n]on-judicial officials whose official duties have an integral relationship with the judicial process," <u>Henry v. Farmer City State Bank</u>, 808 F.2d 1228, 1238 (7th Cir. 1986), such as individuals who undertake "administrative" functions at the "explicit direction of a judicial officer."  <u>Richman</u>, 270 F.3d at 435.

In determining whether quasi-judicial immunity applies, the relevant question is whether the plaintiff is challenging a judge's decision-making or specific orders, or whether the plaintiff is challenging the manner in which the decision was enforced.  <u>Id.</u> ("[W]hen the conduct directly challenged is not the judge's decision making, but the manner in which that decision is enforced, . . . the law enforcement officer's fidelity to the specific orders of the judge marks the boundary for labeling the act 'quasi-judicial.'").  For example, the court of appeals has recognized absolute immunity for law enforcement officials who were enforcing a foreclosure judgment ordered specifically by a judge.  <u>Henry</u>, 808 F.2d at 1238–39.  In <u>Henry</u>, the source of the plaintiff's wrong was the judge's order itself, so a suit against the officers was not the appropriate vehicle for challenging the validity of that order.  <u>Id.</u> Instead, the plaintiff needed to appeal the judge's order in state court.  <u>See also</u> <u>Richman</u>,

270 F.3d at 437 (under circumstances like those in Henry, "extension of absolute immunity is not primarily to protect the enforcement function performed by the deputies, but rather to protect the judicial decision-making function by discouraging collateral attacks and encouraging appeals."). See also Kincaid v. Vail, 969 F.2d 594, 601 (1992) (clerk who refused to accept filing of complaint at direction of judge was entitled to quasi-judicial immunity); Dellenbach v. Letsinger, 889 F.2d 755, 763 (7th Cir. 1989) (court reporter and clerks who told plaintiff to pay for unnecessary transcript at request of judge were entitled to quasi-judicial immunity). In contrast, the court of appeals has denied quasi-judicial immunity in cases in which the plaintiff was not challenging conduct specifically authorized by a judge. Zoretic v. Darge, 832 F.3d 639, 644 (7th Cir. 2016) (denying absolute immunity to deputies who carried out eviction based on court order that had already been executed); Hernandez v. Sheahan, 455 F.3d 772, 776 (7th Cir. 2006) (denying absolute immunity to deputies who detained wrong person wanted on arrest warrant); Richman, 270 F.3d at 437–38 (refusing to extend absolute immunity from wrongful-death claim to deputies who responded to judge's order to seize litigant in court).

In this instance, plaintiffs are not challenging conduct specifically authorized or directed by a judge. As discussed above, plaintiffs are not challenging the issuance of the writ of execution itself or even the validity of the writ. Rather, they are complaining about the manner in which defendants executed the writ and about conduct that occurred during defendants' operation that was not specified by the writ. Defendants have presented no evidence suggesting that the state court was involved in deciding how the writ would be

executed or in planning the operation on plaintiffs' property, or even that the court gave any consideration to how much force should be used to execute the writ. Certainly, defendants have not presented evidence that the state court ordered defendants to confiscate plaintiff's cell phone and camera and arrest him for disorderly conduct. Rollins v. Murphy, 598 F. App'x 449, 451 (7th Cir. 2015)(quasi-judicial immunity did not bar false arrest claim where plaintiff did not "assert that the officer arrested him at the instruction of the judge"); Henderson v. Bryant, 606 Fed. App'x 301, 305 (7th Cir. 2015) ("[A] claim that a defendant enforced a court order in an unconstitutional *manner* is not necessarily barred by quasi-judicial immunity.") (emphasis in original). Thus, plaintiffs' claims are not based on any misconduct by the judge and are not a collateral attack on the judge's order. Because plaintiffs are suing defendants for defendants' own alleged misconduct that occurred after the writ was issued, they could not have raised their challenges in an appeal of the writ itself. Accordingly, defendants are not entitled to quasi-judicial immunity.


C. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity with respect to each of plaintiffs' claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). In other words, qualified immunity "shields from liability police officers 'who act in ways they reasonably believe to be lawful.'" Jewett v. Anders, 521 F.3d 818, 822

(7th Cir. 2008) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once it is raised. Rabin v. Flynn, 725 F.3d 628, 632 (7th Cir. 2013). To defeat the qualified immunity defense, a plaintiff must show that: (1) the defendant violated a constitutional right and (2) the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation. Saucier v. Katz, 533 U.S. 194, 201–02 (2001). These questions can be addressed in either order. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Ewell v. Toney, 853 F.3d 911, 919 (7th Cir. 2017). I address the parties' arguments with respect to each of plaintiffs' claims below.

1. Level of force in enforcing the writ of execution

Plaintiffs contend that it was unreasonable under the Fourth Amendment for defendants to bring 24 armed law enforcement officers and a Lenco Bearcat to enforce a surprise writ of execution at the property of an elderly couple, particularly where none of the Hoeppners had a history of physical violence. Defendants disagree, stating that it was reasonable for defendants to assign a large number of deputies and a Bearcat to satisfy the writ of execution, because the writ involved the removal of large amounts of property, the writ arose out of longstanding contentious litigation in the community and defendants knew that the Hoeppners could become confrontational. In particular, defendant Captain Bean was aware of the history of animosity and verbal altercations between the Hoeppners and town officials and knew that the sheriff department's had been called to intervene between

the Hoeppners and town officials on numerous occasions. He also knew that one of the Hoeppners had pointed his finger as if shooting a gun toward deputies during a previous seizure of property.

The Fourth Amendment prohibits the use of excessive force during a search or seizure, such as the use of force or restraints "that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." Archer v. Chisholm, 870 F.3d 603, 617 (7th Cir. 2017) (quoting Los Angeles County v. Rettele, 550 U.S. 609, 614 (2007)). The test of reasonableness is an objective one, based on the "perspective of a reasonable officer at the time." Id. In this instance, I conclude that it was not unreasonable under the Fourth Amendment for defendants to deploy a large number of law enforcement officers and an armored vehicle when executing the writ. In light of the information available to defendants when planning the operation, it was reasonable for defendants to believe that a large force would be necessary to collect the extensive property identified in the writ in an efficient manner. Additionally, defendants were aware from studying an incident in Richland County that deputies executing a writ on property might be met with force. Defendants also knew that the Hoeppners had a confrontational history with the town, which had obtained the writ. Finally, defendants did not show up at plaintiffs' door with 24 officers and an armored vehicle. Defendants' plan called for two deputies to approach plaintiffs' house in an attempt to make contact with the Hoeppners peacefully, while the other officers and vehicles remained out of sight. Although the plan to engage plaintiff in conversation about the writ was unsuccessful, the plan was reasonable. The deputies never deployed any weapons. Nor

did they apparently use the armored vehicle for anything. Therefore, although it was no doubt unnerving for plaintiff to look out his window and see armed deputies and an armored vehicle outside, defendants' use of force did not violate the Fourth Amendment.

Moreover, even if defendants' use of force violated the Fourth Amendment, defendants are entitled to qualified immunity. Plaintiffs have identified no clearly established law that prohibited the type of force used in this case. The cases on which plaintiffs rely are distinguishable, as they involve situations in which police officers pointed guns directly at individuals who presented no threat of violence. Baird v. Renbarger, 576 F.3d 340, 342, 344 (7th Cir. 2009) (unreasonable to use submachine gun to round up and detain people during search of store related to non-violent crime where there was "no reason to believe that there would be resistance"); Jacobs v. City of Chicago, 215 F.3d 758, 773–74 (7th Cir. 2000) (pointing gun at elderly man's head for 10 minutes even after realizing that he is not desired suspect and presented no resistance is "out of proportion to any danger that [the man] could possibly have posed to the officers or any other member of the community"); McDonald v. Haskins, 966 F.2d 292, 294–95 (7th Cir. 1992) (pointing gun at nine-year-old child during search and threatening to pull trigger was "objectively unreasonable").

In contrast, Archer v. Chisholm, 870 F.3d 603, 610 (7th Cir. 2017), involves facts much more similar to those in the present case. In that case, police officers arrived early in the morning at the plaintiff's home to execute a search warrant related to an investigation into public corruption. Police "thunderous[ly] hammered" on the front door and "shouted

that she had to open it or they would break it down." Id.  The police brought a "battering ram" onto the plaintiff's front lawn.  When the plaintiff opened her door, officers "entered with their guns drawn and proceeded to search every nook and cranny." Id. The search lasted several hours, during which time officers prohibited the plaintiff and her partner from leaving the house, even though her partner needed to get to work. Id.  The court of appeals concluded that although the police tactics were "rough," id., there was nothing "objectively unreasonable" in what occurred.  Id. at 617. The court noted that the police never used the battering ram and quickly holstered their guns upon entry into the plaintiff's house. Id. Thus, although the plaintiff was "undoubtedly startled to wake up to armed police at her door with a battering ram in the yard, . . . [a]pprehension that the police might do something falls short of a showing that they actually did use objectively abusive tactics." Id. Therefore, the court of appeals concluded that there was no Fourth Amendment violation.

In sum, plaintiffs have failed to show that defendants violated clearly established law that prohibited the level of force deployed by defendants.  Instead, the undisputed facts show that defendants used force similar to that in Archer, 870 F.3d 603, which was found not to violate the Fourth Amendment.  Accordingly, defendants are entitled to summary judgment with respect to plaintiffs' claim that defendants violated the Fourth Amendment by using excessive force in enforcing the writ.

2.  False arrest

Plaintiff contends that defendants McCarthy, Berdal and Heggelund arrested him

without probable cause in violation of the Fourth Amendment. Defendants contend that they had probable cause to arrest plaintiff for disorderly conduct under Marathon County Ordinance § 9.01, the ordinance for which he was arrested and cited. That ordinance applies to anyone who

> in a public or private place, engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which conduct tends to cause or provoke a disturbance.

Defendants also argue that there was probable cause to arrest plaintiff for disorderly conduct under state law, Wis. Stat. § 947.01. Under the statute, disorderly conduct has two elements: (1) "that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct"; and (2) "that the defendant's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance." Gibbs v. Lomas, 755 F.3d 529, 538 (7th Cir. 2014) (citing Wis. Stat. § 947.01(1) and State v. Schwebke, 2002 WI 55, ¶ 20, 253 Wis. 2d 1, 644 N.W.2d 666, 674). The disorderly conduct statute only "proscribes speech that is not constitutionally protected." State v. A. S., 2001 WI 48, ¶ 16, 243 Wis. 2d 173, 189, 626 N.W.2d 712, 718.

Defendants also argue that even if they did not have probable cause, they are entitled to qualified immunity. For false arrest claims, defendants are entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." Fleming v. Livingston County, Illinois, 674 F.3d 874, 878 (7th Cir. 2012) (Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir.1998) (citations omitted)). Thus, as long as defendants reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest plaintiff,

defendants are entitled to qualified immunity. Id. This standard is often dubbed "arguable probable cause." Id. (citations omitted). Arguable probable cause is established "when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'" Id. at 880.

To overcome defendants' qualified immunity defense, plaintiff would have to "'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (citing White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam). Although it is not necessary to have "'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" Id. (citations omitted).

Under these principles, I conclude that genuine disputes of material fact preclude a grant of summary judgment to either side on plaintiff's false arrest claim. Defendants say that plaintiff engaged in boisterous and unreasonably loud conduct and could have provoked a disturbance when he came out of his house yelling, swearing and pointing at deputies. Defendants further argue that plaintiff refused to comply with police orders to calm down and stop moving around, instead telling officers they would have to arrest him to gain his compliance. If a jury accepted defendants' version of events, they could conclude that plaintiff's conduct constituted disorderly conduct. However, plaintiff admits that he was upset about the number of law enforcement officers and the armored vehicle on his property, but denies that he was boisterous or belligerent, denies that he was "walking around the

property," denies that he was interfering with or impeding the deputies in any way and denies that he was given any orders, let alone that he refused to obey orders. He alleges that he was arrested solely because he was taking pictures of the scene and because he responded sarcastically to an officer's suggestion that he produce $80,000 on the spot. If a jury believed plaintiff, it could reasonably conclude that defendants did not have probable cause to believe plaintiff's actions qualified as disorderly conduct.

In particular, if plaintiff's version of events is true, defendants had no reason to believe that his conduct satisfied either element of Wisconsin's disorderly conduct statute. Plaintiff denies being violent, abusive, indecent, profane, boisterous or unreasonably loud, and contends that his speech was protected by the First Amendment. He also denies that his conduct could have caused or provoked any disturbance, as the only people who heard his statements were law enforcement officers. Schwebke, 2002 WI 55, ¶¶ 30, 31 ("Conduct is not punishable under the statute when it tends to cause only personal annoyance to a person. . . [W]hen the conduct tends to cause or provoke a disturbance that is private or personal in nature, there must exist the real possibility that this disturbance will spill over and cause a threat to the surrounding community as well.")

Moreover, qualified immunity does not help defendants because even qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment. Board v. Farnham, 394 F.3d 469, 476 (7th Cir. 2005). If I construe the facts in plaintiff's favor, a reasonable jury could find that defendants did not have even arguable probable cause to arrest plaintiff for disorderly conduct. At the

time, it was clearly established that Wisconsin's disorderly conduct laws criminalize only violent, abusive, indecent, profane, boisterous or unreasonably loud conduct where there is a "real possibility that this disturbance or disruption will spill over and disrupt the peace, order or safety of the surrounding community as well." Schwebke, 2002 WI 55, ¶¶ 30. See, e.g., State v. Werstein, 60 Wis.2d 668, 211 N.W.2d 437 (1973) (mere presence in military recruitment office and mere refusal to obey a police command was not disorderly conduct); State v. Becker, 51 Wis. 2d 659, 665, 188 N.W.2d 449, 452 (1971) ("yelling very loudly" at police officer without "engag[ing] in unreasonably loud conduct" that would "offend the normal sensibilities of average persons" not enough to establish disorderly conduct). Under plaintiff's version of events, no reasonable officer would have concluded that plaintiff was engaging in disorderly conduct. Therefore, defendants are not entitled to qualified immunity on plaintiff's false arrest claim.

3. Seizure of cell phone and camera

Plaintiff contends that defendants' seizure of his cell phone and camera violated his rights under the First and Fourth Amendments. He also argues that he was arrested in retaliation for exercising his First Amendment rights to take pictures of the events on his property. Defendants' only argument with respect to the Fourth Amendment claim is that the cell phone and camera were seized pursuant to a lawful arrest. However, there are genuine factual disputes as to whether plaintiff's property was seized before or after his arrest and whether the arrest was lawful. Therefore, summary judgment cannot be granted on

plaintiff's Fourth Amendment theory. (Defendants also argue in their reply brief that they were not personally responsible for taking plaintiff's camera and cell phone, but arguments raised or developed for the first time in a reply brief are waived. Mendez v. Perla Dental, 646 F.3d 420, 423-24 (7th Cir. 2011)).

Turning to the First Amendment, defendants argue that plaintiff had no clearly established right to take pictures of their operation under the circumstances present in this case. They acknowledge that in American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (7th Cir. 2012), the Court of Appeals for the Seventh Circuit held in the context of a preliminary injunction that an Illinois statute prohibiting individuals from making audio recordings of police officers performing their duties in public triggered heightened First Amendment scrutiny and likely violated the First Amendment. In Alvarez, the court stated that "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." Id. at 595. The court further explained that the public has "strong" First Amendment interests in "free discussion of government affairs" and in "gathering news and information . . . about the affairs of the government." Id. at 597 (citing Glik v. Cunniffe, 655 F.3d 78, 79 (1st Cir. 2011) (holding there is an "unambiguous[ ]," constitutionally protected right to videotape police carrying out their duties in public)).

However, defendants point out that Alvarez left open the possibility of reasonable time, place and manner restrictions on the right to record police officers conducting their duties. Alvarez, 679 F.3d at 607. Defendants argue that in this instance, it was reasonable

for officers to restrict plaintiff from taking pictures, as "[t]he act of moving around the property and taking photographs while deputies are attempting to conduct their duties may interfere with said duties and may further risk injury to both [plaintiff] and the deputies involved." Dfts.' Br., dkt. #62, at 38. They further suggest that plaintiff was "interfering with law enforcement as they conduct[ed] their duties." Id.

Plaintiff denies that he was interfering with the deputies' attempts to enforce the writ and says that his picture-taking presented no safety risk at all. If plaintiff's version of events is true, defendants' confiscation of plaintiff's property and his subsequent arrest was not a reasonable time, place and manner restriction and violated his First Amendment rights. Accordingly, I will deny defendants' motion for summary judgment on plaintiff's First Amendment claim.

ORDER

IT IS ORDERED that

1. Plaintiffs Roger Hoeppner and Marjorie Hoeppner's motion for partial summary judgment, dkt. #58, is DENIED.

2. Defendants' motion for summary judgment, dkt. #44, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiffs' Fourteenth Amendment due process claim and plaintiffs' Fourth Amendment claim that defendants used unreasonable force in enforcing the writ of execution on October 2, 2014. The motion is DENIED in all other respects.

3.  This case will proceed to trial on plaintiff Roger Hoeppner's false arrest claim and his claims relating to the seizure and destruction of his cell phone and camera.

Entered this 23d day of October, 2018.

BY THE COURT:
/s/

_____
BARBARA B. CRABB
District Judge